# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-KA-00071-COA

**RICKARIUS KIMBLE A/K/A RICHARIUS KIMBLE**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                    **APPELLEE**

DATE OF JUDGMENT:          01/17/2017
TRIAL JUDGE:               HON. LINDA F. COLEMAN
COURT FROM WHICH APPEALED: BOLIVAR COUNTY CIRCUIT COURT,
                           FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:    OFFICE OF STATE PUBLIC DEFENDER
                           BY: HUNTER NOLAN AIKENS
ATTORNEY FOR APPELLEE:     OFFICE OF THE ATTORNEY GENERAL
                           BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:         BRENDA FAY MITCHELL
NATURE OF THE CASE:        CRIMINAL - FELONY
DISPOSITION:               AFFIRMED - 09/18/2018
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE GRIFFIS, P.J., BARNES AND GREENLEE, JJ.**

**GREENLEE, J., FOR THE COURT:**

¶1. A Bolivar County jury found Rickarius Kimble guilty of rape. Kimble was sentenced to serve fifteen years in the custody of the Mississippi Department of Corrections (MDOC), with five years suspended and five years of supervised probation. Kimble appeals, challenging the sufficiency and weight of the evidence and asserting that he received ineffective assistance of counsel. We affirm Kimble's conviction and sentence.

## PROCEDURAL BACKGROUND

¶2. On August 29, 2016, a Bolivar County grand jury indicted Kimble for Count One,

burglary, in violation of Mississippi Code Annotated section 97-17-23 (Rev. 2014), and Count Two, forcible sexual intercourse in violation of Mississippi Code Annotated section 97-3-65(4)(a) (Rev. 2014). Trial commenced on October 10, 2016. After the State's case-in-chief, Kimble moved for a directed verdict, which the trial court denied. At the close of all evidence, Kimble's counsel renewed his motion and requested a peremptory instruction directing a verdict for the defendant for both burglary and rape. The trial court denied the instruction as to both counts. Following trial, the jury found Kimble not guilty of burglary, but guilty of rape. On appeal, Kimble argues that the jury's verdict as to rape was contrary to the sufficiency and weight of the evidence.

**FACTS**

¶3.    In September 2015, Lakeisha Adams was living in a trailer in Benoit, Mississippi, with her son and her boyfriend, Jeremy Franklin. On the night of September 4, Franklin was working out of town, and Adams returned home with her son at approximately 10 p.m. When Adams arrived at her front door, she found herself locked out; her only key went to the doorknob, and someone had locked the deadbolt. Suspecting a break-in, Adams called the police and her stepfather, Sidney Taylor. Taylor arrived first and walked around the trailer, finding Adams's back door unlocked and slightly open. When the police arrived, Adams reported the break-in.

¶4.    Before she went to bed that night, Adams made sure that all of the doors were locked. She also placed a pair of scissors in her son's bedroom window and a chair under the front doorknob to prevent anyone from entering the trailer. Adams testified that after she fell

2

asleep, she heard a noise, jumped out of bed, and grabbed the loaded gun she kept in her bedroom. Before she was able to look for a possible intruder, Kimble attacked her.

¶5.    Adams said that Kimble tackled her, grabbed her arm, took her gun away from her, and knocked her through the television stand in her bedroom. Then, he grabbed her around the throat and dragged her to the living room. Adams testified that in the living room, Kimble pointed out that he was wearing all black clothes and blue hospital gloves. Kimble stated, "B****, I came here to do this," and he told Adams to take her underwear off. Adams testified that she was only wearing a shirt and underwear at the time and that she eventually pulled her underwear down after Kimble grabbed her by the hair and pushed her face down on the living-room couch. Adams further testified that she tried to stall for time by asking Kimble whether he had a condom. Kimble produced a condom and made her put it on him. Then, Kimble made her lean over the couch, and he put his penis inside her vagina and allegedly raped her. Adams testified that as Kimble was raping her, the condom came off and Kimble had her put it back on. Kimble resumed the alleged assault, but his penis kept slipping out, so he made Adams lie on her back and forcibly performed oral sex on her. He then made her face the couch but realized the condom had broken. Adams said Kimble laughed and opened some paper towels and tissues, which he used to wipe himself with. He then handed Adams a paper towel, which she wiped herself with.

¶6.    Adams said that after Kimble raped her, he sat on her furniture and told her, "[N]o face, no case, but you saw my face, so I [have] to kill you." He said "[I]t's either me or . . . you" and "I ain't going to jail." Kimble asked Adams to give him bullets, and when Adams

3

responded that she did not have any, Kimble said "B****, if I go in here and there's no bullets in the drawer, I'm gonna kill you." Adams said Kimble never checked the drawer for bullets.

¶7. Kimble supposedly told Adams that a person called "Gingerbread" said a person called Franklin owed a person called "Sambo" money, and Kimble had been sent to kill her. Adams testified that she knew a "Gingerbread" but not a "Sambo." Adams said she offered Kimble money, but he stated, "I don't want your money"; "I supposed to did this s**** and been gone." Kimble then took Adams's phone and called someone. He told Adams the person he spoke with "told him to leave and come back the next day and burn [them] up." Adams asked Kimble if he was going to come back, but he said, "No." Adams said Kimble touched a can of roach spray before he left.

¶8. Adams testified that after Kimble left, she got her child, looked for her keys, went to her mother and stepfather's apartment, and called Taylor to open the door. Adams stated that during the assault, her son was in her bedroom screaming but never came out of the bedroom. Adams said that when she drove to her mother and stepfather's apartment, she took her gun with her. She said that she found her gun on her living-room floor.[1] Taylor testified that Adams arrived at his house a little after 6 a.m., and was "crying, hooping and hollering, [with] hair all over her head." Taylor called the police.

¶9. Deputies Johnathan Trotter, Michael Honorable, and Youlander Harris, with the

---

[1] Adams testified that she did not see the gun on the living-room floor until after Kimble left. She said that the last time she saw it was when Kimble dragged her to the couch.

4

Bolivar County Sheriff's Department, responded to the call. Deputy Trotter testified that when he arrived at Taylor's residence, Adams was giving a statement to Deputy Harris. He observed that Adams was "real shaky" and was crying. Adams told the officers that she had been assaulted at her home. Deputy Trotter then called Investigator Michael Williams, who instructed Deputy Trotter to gather Adams's clothes from her home and ensure that Adams visited the hospital to have a sexual assault exam.

¶10.    Deputy Trotter testified that he and the other deputies accompanied Adams to her trailer. He said they walked through the trailer, looking to see where Kimble entered. Deputy Trotter said he observed that in one of the bedrooms, the blinds had been removed, and a pair of scissors were lying under the window behind a dresser. Trotter said that below the window outside, he saw a child's toy car that had a dusty footprint on it. Trotter stated that it looked like somebody had used it "to maybe . . . get up, inside of the house." Deputy Trotter acknowledged that although the window's blinds were damaged, neither the window itself nor the frame was damaged.

¶11.    Investigator Williams testified that he likewise reported to Adams's home to secure the scene, take photographs, and collect evidence. Investigator Williams said that he photographed and secured several items Kimble may have touched, including a paper towel, a pair of gloves, a condom, a can of insect spray, and a role of duct tape. The pictures were admitted into evidence. Investigator Williams further testified that he also collected a loaded gun. He did not testify as to where, how or from whom he obtained the gun. It too was admitted into evidence.

5

¶12. Deputy Harris took Adams to the Bolivar County Medical Center, where Nurse Lee Levingston was working. Levingston testified that Adams told her she had been assaulted, choked, and raped, so Levingston conducted a sexual assault exam to collect any evidence. Levingston first completed a physical examination of Adams, which did not reveal any redness, bruising, scrapes, abrasions, cuts, or lacerations on Adams's body. Levingston stated that in many instances bruises may not appear until the day after an injury occurs. As part of the sexual assault exam, swabs were taken from Adams's labia and vagina. When Adams arrived home from the hospital, she noticed that she had carpet burns on her knee, a cut on her finger, and bruises on her lower back and buttocks. Adams had her boyfriend, Franklin take pictures of these injuries, and the pictures were admitted into evidence.

¶13. Meanwhile, police began searching for Kimble. Near the end of his shift, Deputy Trotter received a dispatch call informing him that Adams's family members had located Kimble and "were chasing him through the town." Roughly an hour later, Deputy Trotter apprehended Kimble.

¶14. While in custody, Kimble gave a statement to police in which he initially denied knowing Adams and going to her trailer. Later in his statement, Kimble told the police that Adams gave him her trailer keys. Kimble stated that he went to Adams's trailer, the door was unlocked, and Adams let him in. When the police suggested that Kimble's "DNA may have been left behind" in the trailer, Kimble said that he and Adams had a secret relationship. Kimble also described Adams's gun in detail.

¶15. Kimble gave his written consent to provide DNA samples to investigators with the

6

Bolivar County Sheriff's Department, and his signed consent form was admitted into evidence. His DNA sample, along with the swabs from Adams's sexual assault exam, was given to the Mississippi Crime Lab to perform DNA analysis. A forensic DNA analyst testified that he performed tests on the swabs and could not exclude Kimble as a possible contributor to the male DNA found on Adams's vaginal swabs. The analyst further testified that the odds that the DNA was not Kimble's were approximately one in ten billion.

¶16. Kimble called Police Chief Billie Williams of the Benoit Police Department, and his father, Richard Lawrence in his defense. Chief Williams testified that after the alleged rape, he purchased Adams's trailer from her parents. Chief Williams said that after purchasing the trailer, he changed the doorknob lock and the deadbolt lock on the front door. He said that he had never opened or tried to unlock the back door. Chief Williams testified that a few days before trial, Kimble's father, Lawrence, contacted him and asked for permission to test a key on the trailer's back door. Chief Williams told Lawrence he would have to obtain the present occupant's permission.

¶17. Lawrence testified that three days after Kimble's arrest, Kimble called him and asked him to look for a set of keys. Lawrence found the keys in a pair of Kimble's pants at his house. A week before trial, Lawrence went to Adams's old trailer and tried to use the keys on the back door. Lawrence testified that one of the keys fit inside the back deadbolt lock, but it would not turn. He used a key on the lower doorknob lock; it went inside, and the knob turned. Lawrence explained that he turned the knob a bit, but he did not open the door or go inside the trailer because someone currently lived there. Lawrence testified that it was his

opinion that he could have opened the door, although he was not certain. He said that the door was seemingly jammed because the door or lock was bent, but the key did allow him to turn the knob when he inserted it.

¶18.    Kimble testified on his own behalf. Kimble testified that he saw Adams twice on September 4, 2015: once at a local Quick Mart and once at the library. He testified that he saw Adams at the Quick Mart around 11 a.m., had a friendly conversation with her, and invited her to a football game that night. Kimble said that Adams told him she was already going to the game with some friends. Kimble testified that he saw Adams in front of the library at about 4 p.m., and they spoke again. Kimble further testified that Adams told him that she would be home after the football game. He said Adams gave him the keys to her trailer and told him they would unlock her back door. Kimble said he had met Adams through her boyfriend, Franklin, whom he had visited at Adams's trailer. Kimble testified that he knew Franklin was out of town that evening.

¶19.    Kimble testified that he went to Adams's trailer while Adams was at the football game, and he tried to use the keys to see if they worked. He went to a club until it closed at about 2:00 a.m. and then walked to Adams's trailer. Kimble said that he used the keys Adams gave him to enter the back door around 2:30 a.m.[2] He said that Adams got out of bed; they talked in the living room; and they had consensual sex. He said that he used a condom that Adams gave him, claiming that it was Adams's idea. He also testified that the condom broke during sex. Kimble said that after they had sex, he used Adams's phone to

---

[2] In his police statement, Kimble claimed that Adams let him in, and he did not need to use the keys she gave him.

call another girl—one of Adams's friends—and Adams got mad and snatched her phone.

¶20. Kimble initially testified that he did not know whether Adams owned a gun, and he denied telling officers that she did. Later in his testimony, Kimble said that when he was at Adams's trailer, she showed him a gun for some unknown reason. Kimble testified that Adams's son was in her bedroom and that the television set in the bedroom fell while he and Adams were in the living room having sex. Kimble acknowledged that he touched the condom wrapper, a glove, and a can of insect spray in the trailer. He testified that he did not touch the duct tape. Kimble denied telling Adams to wipe herself off after they had sex, and he testified that he did not see her wipe herself off. Kimble explained that his stepfather, who is also Adams's cousin, uses the name "Gingerbread." Kimble said he did not know a person called "Sambo." Kimble also explained that he initially denied knowing Adams and going to her trailer because he feared that if he told the police that he and Adams had sex, the police would believe it was rape, as Adams alleged.

¶21. Adams denied seeing Kimble or speaking with him earlier in the day, and she denied giving Kimble the keys to her trailer. She also denied that the sex was consensual. Adams testified that she only knew of Kimble because they lived in the same town.

¶22. Following deliberations, the jury found Kimble not guilty of burglary but guilty of rape. Kimble has timely appealed.

## ANALYSIS

### I. Sufficiency and Weight of the Evidence

¶23. On appeal, Kimble challenges the sufficiency and weight of the evidence concerning

his rape conviction.

### A. Sufficiency

¶24. Following the close of the State's case, Kimble moved for a directed verdict on both burglary and rape. After the close of all evidence, Kimble renewed his motion and requested a peremptory instruction directing the jury to find for him on both charges, which the trial court denied. On appeal, Kimble claims the evidence was insufficient to support his rape conviction, arguing that "Adams' testimony was improbable, unreasonable[,] and contradictory."

¶25. "The standard of review for a denial of a directed verdict, peremptory instruction, and a JNOV are identical." *Vaughn v. State*, 926 So. 2d 269, 271 (¶4) (Miss. Ct. App. 2006). "A motion for a directed verdict and request for a peremptory instruction challenge the legal sufficiency of the evidence." *Id.* (citing *McClain v. State*, 625 So. 2d 774, 778 (Miss.1993)). On appeal, we review the trial court's finding regarding the sufficiency of the evidence at the time the motion for a directed verdict or request for a peremptory instruction is denied. *Id.* "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bush v. State*, 895 So. 2d 836, 843 (¶16) (Miss. 2005), *overruled on other grounds by Little v. State*, 233 So. 3d 288 (Miss. 2017). The issue is not whether we would have found Kimble guilty based on the evidence at trial; rather, his conviction must be affirmed if there was enough evidence for "any rational trier of fact" to have returned a guilty verdict. *Id.*

10

¶26. The State had to prove that Kimble had forcible sexual intercourse with Adams to convict him of rape under Mississippi Code Annotated section 97-3-65(4)(a) (Rev. 2014). Kimble argues no juror could have found him guilty beyond a reasonable doubt because Adams's testimony was exceedingly "improbable, unreasonable[,] and contradictory." In support of this argument, Kimble references a number of alleged inconsistencies in the record.

¶27. It is well settled that "the jury is the final arbiter of a witness's credibility." *Collins v. State*, 97 So. 3d 1247, 1251 (¶14) (Miss. Ct. App. 2012) (quoting *Morgan v. State*, 681 So. 2d 82, 93 (Miss. 1996)). Further, "[o]ur system of justice allows the jury to make logical and reasonable inferences and presumptions." *Edwards v. State*, 167 So. 3d 1286, 1289 (¶22) (Miss. Ct. App. 2014). "From these reasonable inferences, even if jurors could have come to different conclusions on each element of the crime, the evidence remains sufficient." *Id.* at 1289-90 (¶22).

¶28. We do not find that the inconsistencies Kimble alleges merit reversal. Viewing the evidence in the light most favorable to the State and giving the State the benefit of all reasonable inferences, the jury could have found Kimble guilty of rape beyond a reasonable doubt. Thus, we find the evidence was sufficient to support the jury's verdict.

### B. Weight

¶29. In reviewing the weight of the evidence in favor of the verdict, "we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Swanagan v. State*, 229 So. 3d 698,

11

705 (¶26) (Miss. 2017). Kimble again claims that Adams's testimony was improbable, unreasonable, and contradictory. He argues the evidence is more consistent with his theory that Adams had consensual sex but claimed rape to avoid being exposed for cheating on her boyfriend. Because Kimble did not file a motion for a new trial, he is procedurally barred from challenging the weight of the evidence on appeal. *See Price v. State*, 749 So. 2d 1188, 1199 (¶38) (Miss. Ct. App. 1999) ("The matter of evidentiary weight is waived by the failure to move for a new trial.").

¶30. Nevertheless, we will consider this issue. Having taken the opportunity to review the evidence, we find that the jury's verdict is not against the overwhelming weight of the evidence. We reiterate that the jury sits as a trier of fact and is charged with resolving conflicts in evidence. *Price v. State*, 847 So. 2d 290, 294 (¶18) (Miss. Ct. App. 2003). Kimble's theory was submitted to the jury at trial, and the jury had the opportunity to consider any inconsistencies in the evidence. We find that allowing the jury's verdict to stand would not sanction an unconscionable injustice. This issue is without merit.

## II. Ineffective Assistance of Counsel

¶31. Kimble alternatively complains that his trial counsel provided ineffective assistance by failing to file a motion for a new trial, thereby procedurally barring him from challenging the weight of the State's evidence.

¶32. As a preliminary matter, Kimble failed to follow Mississippi Rule of Appellate Procedure 28(a)(3), which requires that each issue be separately numbered in a statement of the issues. M.R.A.P. 28(a)(3); *see also Leake v. Leake*, 196 So. 3d 1115, 1117 (¶6) (Miss.

12

Ct. App. 2016). "Failure to present an issue in this fashion bars the issue for appellate review." *Id.* Nevertheless, we will consider Kimble's claim.

¶33. To establish ineffective assistance of counsel, Kimble must prove: (1) his attorney's performance was deficient, and (2) the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687-96 (1984). "To determine whether the counsel's performance was both deficient and prejudicial, this Court examines the totality of the circumstances, keeping in mind that a strong but rebuttable presumption exists that a counsel's conduct falls within the wide range of reasonable professional assistance." *Williams v. State*, 228 So. 3d 949, 952 (¶13) (Miss. Ct. App. 2017) (internal quotation mark omitted). Accordingly, we will find the counsel's performance deficient only where there is a reasonable probability that, but for the counsel's errors, the outcome would have been different. *Holland v. State*, 656 So. 2d 1192, 1197 (Miss. 1995).

¶34. We will address an ineffective-assistance-of-counsel claim on direct appeal only where "(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge." *Wynn v. State*, 964 So. 2d 1196, 1200 (¶9) (Miss. Ct. App. 2007) (quoting *Wilcher v. State*, 863 So. 2d 776, 825 (¶171) (Miss. 2003)). If the record is inadequate to address the claim on direct appeal, we will dismiss the claim without prejudice, preserving Kimble's right to raise his claim in a properly filed motion for post-conviction relief. *Sandlin v. State*, 156 So. 3d 813, 819 (¶20) (Miss. 2013).

¶35. Here, the record is adequate for review because Kimble's argument that his trial counsel provided ineffective assistance by failing to file a motion for a new trial depends on the record and weight of the evidence at trial. Kimble's argument is based on facts fully apparent from the appellate record, therefore we proceed to review it.

¶36. The Mississippi Supreme Court has found that a defense attorney's failure to file a post-trial motion challenging the weight of the evidence constituted deficient performance. *Parker v. State*, 30 So. 3d 1222, 1235 (¶48) (Miss. 2010). In *Parker*, defense counsel moved for a directed verdict at the close of all evidence that preserved the defendant's sufficiency argument but rendered deficient performance by failing to file a post-trial motion challenging the weight of the evidence. *See id.* Because the verdict was not against the overwhelming weight of the evidence, the Court held that Parker was not prejudiced by the error. *Id.* at (¶49). Recently, in *Pace v. State*, 242 So. 3d 107, 118 (¶31) (Miss. 2018), the supreme court found that counsel rendered deficient performance by failing to file post-trial JNOV and new trial motions, but the deficiency had not prejudiced Pace because the sufficiency and weight of the evidence were such that there was no reasonable probability that either motion would have been granted.

¶37. As in *Parker* and *Pace*, Kimble's counsel failed to file a post-trial motion attacking the weight of the evidence. Nonetheless, Kimble has not shown that any prejudice resulted because, as explained above, the jury's verdict was not against the overwhelming weight of the evidence. Thus, we find Kimble has not shown that trial counsel's failure to file a motion for a new trial violated his constitutional right to effective assistance of counsel.

14

**CONCLUSION**

¶38.    We hold that the evidence was sufficient to support Kimble's rape conviction. Notwithstanding the procedural bar to Kimble's weight-of-the-evidence challenge, we find that the weight of the evidence was sufficient to support the jury's verdict. Therefore, Kimble's argument that his counsel provided ineffective assistance by failing to challenge the weight of the evidence is without merit. We accordingly affirm Kimble's conviction.

¶39.    **AFFIRMED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, FAIR, WILSON, WESTBROOKS AND TINDELL, JJ., CONCUR.**